## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| RAHONDA MACCLAIN, <br> in her individual capacity and <br> as Administrator of the Estate <br> of Damion MacClain, Deceased, <br><br>         Plaintiff, <br><br> v. <br><br> BRIAN OWENS, Commissioner, <br> Georgia Department Of Corrections, <br><br> TIMOTHY C. WARD, <br> Assistant Commissioner, Georgia <br> Department of Corrections, <br><br> CLAY TATUM, Former Warden, <br> Hays State Prison, <br><br> SHAY HATCHER, Former Deputy <br> Warden, Hays State Prison, <br><br> BETTY BAILEY-DEAN, <br> Deputy Warden, Hays State Prison <br><br> TIMOTHY CLARK, <br> Former Captain, Hays State Prison, <br><br> JOSHUA JOHNSON, <br> Officer, Hays State Prison, <br><br> LINWOOD BURNS, <br> Officer, Hays State Prison, <br><br>         Defendants. | CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff RaHonda MacClain, in her individual capacity and as Administrator of the Estate of Damion MacClain, deceased, ("Plaintiff") by counsel, states as follows for her Complaint:

## I.    PRELIMINARY STATEMENT

1.     This is a civil rights action brought pursuant to 42 U.S.C. §1983 arising from the death of Damion MacClain.  Mr. MacClain was found dead in a cell at Hays State Prison ("Hays") on December 26, 2012.  He had been stabbed, beaten, and strangled to death by other inmates who—because of lack of supervision, broken cell-door locks long ignored by Defendants, and other dangerous conditions—were able to leave their cells in the middle of the night, assault Mr. MacClain, and kill him.  At the time of Mr. MacClain's murder, Defendants, officers and administrators of the Georgia Department of Corrections ("GDC"), knew that security conditions at Hays had deteriorated to unconstitutional levels, resulting in multiple stabbings, beatings, and assaults on inmates and officers.  Mr. MacClain was the second of three men murdered at Hays during a five-week period between December 2012 and February 2013.[1]  Mr.

_____

[1] Derrick Stubbs was found dead in his cell on December 19, 2012.  Damion MacClain was murdered on December 26, 2012.  Nathaniel Reynolds was stabbed

MacClain died despite his mother's insistence, voiced to Defendant Tatum and others, that Mr. MacClain had been threatened by inmates, was in danger, and needed to be transferred to a facility with adequate security. He died due to the deliberate indifference of the Defendants to a known and pervasive risk of extreme violence at Hays State Prison.

2.      Hays State Prison is one of eleven maximum security prisons in Georgia. Its mission is "housing and managing some of the state's most challenging offenders."[2] About half of the approximately 1,600 inmates at Hays have a "close" security classification. Close security inmates are escape risks, have assaultive histories, are "deemed dangerous," and/or have detainers for other serious crimes.[3] They "require constant supervision by a correctional officer."[4]

---

to death on January 18, 2013. A fourth Hays prisoner, 19-year-old Pippa Hall-Jackson, was stabbed to death by a fellow Hays prisoner on February 5, 2013, at Georgia Diagnostic and Classification Prison, shortly after both men stepped off a bus from Hays State Prison.

[2] Ga. Dep't of Corrections, Hays State Prison, http://www.dcor.state.ga.us/GDC/FacilityMap/html/hays_state_prison.html.

[3] Ga. Dep't of Corrections, Close Security Facilities, www.dcor.state.ga.us/Research/.../Info_Sheets_CloseSecurityPrisons.pdf.

[4] *See id.*

3.     Although Hays houses some of Georgia's "most challenging" offenders, many of the cell doors at the prison have not worked for years. Prison audits from 2008, 2009, 2010, 2011, and 2012 reported that the facility's cell door locks could be easily opened, leaving prisoners to roam in and out of their cells at will. Despite this well-documented security hazard, the Defendants neither fixed the problem with functioning locks, nor took alternative steps to control dangerous inmate movements. The broken cell door locks greatly contributed to a crisis in security at Hays, putting prisoners and officers in danger.

4.     Broken cell door locks were not the only problem at Hays. In recent years, Defendants knew that security conditions there had deteriorated to an unconstitutional level.

(a)     Fights occurred between prisoners on a regular basis resulting in injuries requiring medical attention and hospitalization.

(b)     Prisoners were heavily armed with shanks, knives, and other weapons.

(c)     Weapons were often not confiscated from prisoners as required by standard operating procedure.

(d)     There were multiple reports of stabbings and deaths.

(e)     The prison was understaffed, such that critical security posts were unmanned, leaving prisoners without adequate supervision.

(f)     There was a lack of monitoring and supervision of close security inmates, which allowed inmate-on-inmate violence.

(g)     Prisoners routinely slept in cells to which they were not assigned.

(h)     Numerous prisoners possessed contraband cell phones, which allowed prisoners to coordinate assaults on other prisoners.

(i)     Gang leaders exercised control over housing assignments, and their decisions to expel prisoners they no longer wanted in their dorms were accepted by prison officials.

(j)     Prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

(k)     Several officers were stabbed or otherwise seriously injured.

(l)     Officers often remained in control rooms because they were afraid to enter prison dorms.

5.     The Defendants were deliberately indifferent in responding to the known security hazards at Hays, even as the level of violence escalated and numerous inmates and officers were victimized.  Two of the Defendants exacerbated the breakdown in security by alerting inmates to upcoming security "shakedowns," with the goal of advancing their careers by achieving positive reviews on departmental audits.[5]

_____

[5] Joy Lukachick, *Guards Blame Hays State Prison Higher-Ups for Security Failures*, Chattanooga Times Free Press, Mar. 17, 2013 (reporting that on the night before a June 2011 security "shakedown," Hays supervisors ordered officers to "go cell to cell and warn inmates that squads were coming to search for their homemade knives and illicit cell phones" and further reporting that inmates were rewarded with pizza and buckets of fried chicken for successfully concealing their contraband).

6.     Defendants were further on notice that the prisoner charged with killing Damion MacClain had a history of assault.  He had been convicted of murder, and he allegedly slashed the throat of another man at Georgia State Prison just 17 months before Mr. MacClain's death.  Instead of taking reasonable precautions to prevent the inmate from further harming others, Defendants housed him in an area of Hays State Prison where many of the cell door locks did not work.

7.     Defendants' actions and inactions proximately caused Mr. MacClain's death, in violation of the Eighth Amendment to the United States Constitution. Plaintiff seeks damages for the death of her son due to the deliberate indifference of the Defendants.

## II.     JURISDICTION

8.     This action is brought pursuant to 42 U.S.C. § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3) and (4).

## III.     VENUE

9.     Venue is proper in this District and in the Rome Division because Mr. MacClain was killed at Hays State Prison, which is located in Trion, Georgia. Hays State Prison is situated within the district and divisional boundaries of the Northern District of Georgia, Rome Division.

## IV.  PLAINTIFF

10.     Plaintiff RaHonda MacClain is the mother of Damion MacClain and the Administrator of her deceased son's estate.  Mr. MacClain was convicted of armed robbery and related offenses in DeKalb County on June 13, 2006.  On December 26, 2012, Mr. MacClain, 27, was found dead in a prison cell at Hays State Prison.  Mr. MacClain was strangled and sustained stab wounds and blunt force trauma to his head.  Mr. MacClain was killed by another inmate or inmates who, because of broken locks on cell doors, lack of supervision, and other security failures, were able to leave their cells, assault Mr. MacClain, and kill him in the middle of the night.  Ms. MacClain brings this action in her individual capacity and in her capacity as administrator of the estate of Damion MacClain.

## V.  DEFENDANTS

11.     Brian Owens is and was at all relevant times the Commissioner of the Georgia Department of Corrections.  As Commissioner, Defendant Owens is responsible for the supervision of operations at GDC facilities.  Commissioner Owens knew about the longstanding and pervasive problem of violence, broken cell door locks, understaffing, and serious security lapses at Hays as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners.  Commissioner Owens is sued in his individual capacity.

12.     Timothy Ward is and was at all relevant times the Assistant Commissioner of the GDC.  As Assistant Commissioner, Defendant Ward shares responsibility for the supervision of operations at GDC facilities.  At the time of Mr. MacClain's death, Defendant Ward was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence, understaffing, and broken locks.  Defendant Ward knew about the longstanding problem of broken locks on cell doors, but failed to take reasonable steps to fix the problem, and failed to control inmate movement by other means.  Defendant Ward further knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners.  Defendant Ward is sued in his individual capacity.

13.     Clay Tatum was the warden at Hays State Prison at all times relevant to this action.  Warden Tatum had final responsibility for the day-to-day operations at Hays State Prison.  At the time of Mr. MacClain's death, Warden Tatum was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken locks.  Warden Tatum knew about the longstanding problem of broken locks on cell doors, but he failed to take reasonable steps to fix the problem and failed to control inmate

movement by other means.  Warden Tatum further knew that Hays prisoners were

subject to a serious risk of harm from violence as described in this Complaint, but

he deliberately ignored the known serious risk of harm to prisoners.  Moreover,

Defendant Tatum exacerbated the level of violence at Hays by permitting gang

members to control dorm housing assignments and by allowing prisoners to

possess dangerous contraband.  Finally, Warden Tatum specifically knew of the

risk of harm to Mr. MacClain because Plaintiff told Warden Tatum that Mr.

MacClain had been threatened and was in danger.  Warden Tatum is sued in his

individual capacity.

14.     Shay Hatcher was a Deputy Warden of Security at Hays State Prison

at all times relevant to this action, and he was the Assistant Shift Supervisor on the

date of Mr. MacClain's death.  Deputy Warden Hatcher shared responsibility for

the day-to-day operations at Hays State Prison.[6]  At the time of Mr. MacClain's

death, Deputy Warden Hatcher was on notice of the life-threatening conditions at

---

[6] In 2000, Deputy Warden Hatcher (then a Sergeant) was "[t]erminated for
misconduct" from Hays State Prison.  *See* State of Ga., Dep't of Labor, Separation
Notice, Aug. 14, 2000.  He had been charged with "us[ing] profanity toward an
inmate or inmates," telling an inmate to "twirl like a ballerina," and humiliating
and degrading inmates by making them "simulate oral sex," while Defendant
Hatcher made lewd and inappropriate comments.  *See* Ga. Dep't of Corrections,
Position/Personnel Action Request, Aug. 1, 2000, at 3.  GDC rehired Defendant
Hatcher just months later.

9

the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks. Deputy Warden Hatcher knew about the longstanding problem of broken locks on cell doors, but he failed to take reasonable steps to fix the problem and failed to control inmate movement by other means. Defendant Hatcher further knew that Hays prisoners were subject to a serious risk of harm from violence as set forth in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners. Defendant Hatcher exacerbated the level of violence at Hays by: (1) ordering subordinates to warn inmates in advance of tactical squad searches; (2) permitting gang members to control dorm housing assignments; and (3) allowing prisoners to possess dangerous contraband. Defendant Hatcher is sued in his individual capacity.

15. Betty Bailey-Dean was a Deputy Warden of Care and Treatment at Hays State Prison at all times relevant to this action. Deputy Warden Bailey-Dean shared responsibility for the day-to-day operations at Hays State Prison. At the time of Mr. MacClain's death, Deputy Warden Bailey-Dean was on notice of the life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks, and she knew of violent threats against Mr. MacClain specifically. Deputy Warden Bailey-Dean knew about the

longstanding problem of broken locks on cell doors, but she failed to take reasonable steps to fix the problem and failed to control inmate movement by other means. Defendant Bailey-Dean further knew that Hays prisoners were subject to a serious risk of harm from violence as set forth in this Complaint, but she deliberately ignored the known risk of serious harm to prisoners. Defendant Bailey-Dean is sued in her individual capacity.

16. Timothy Clark was a Captain at Hays State Prison at all times relevant to this action. Captain Clark shared responsibility for the day-to-day operations at Hays State Prison. At the time of Mr. MacClain's death, Captain Clark was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks. Captain Clark knew about the longstanding problem of broken locks on cell doors, but he failed to take reasonable steps to fix the problem and failed to control inmate movement by other means. Defendant Clark further knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners and officers. Defendant Clark exacerbated and encouraged the level of violence at Hays by: (1) ordering subordinates to warn inmates in advance of tactical squad

searches; (2) permitting gang members to control dorm housing assignments and conduct orientation for incoming inmates; and (3) allowing prisoners to possess dangerous contraband. Defendant Clark is sued in his individual capacity.

17. Joshua Johnson was a correctional officer at Hays State Prison at all times relevant to this action. Officer Johnson was on duty in A-Building and was charged with monitoring inmates residing therein, including Damion MacClain, when Mr. MacClain was murdered on December 26, 2012. Prior to and at the time of Mr. MacClain's death, Officer Johnson knew that Hays was a maximum security prison with a high rate of violence, an armed inmate population, and malfunctioning door locks. Officer Johnson also knew that, seven days earlier, a prisoner had been murdered. Despite that knowledge, Officer Johnson failed to make his required rounds in A-building in the hours before and during the fatal assault on Mr. MacClain. Further, prior to and at the time of Mr. MacClain's death, Officer Johnson knew that numerous inmates in A-Building had left their cells after a lockdown order had been issued, but he failed to take any steps to ensure that inmates were secured back in their cells or to alert other correctional staff to this serious risk to prisoners' safety. Officer Johnson further knew that Hays prisoners were subject to a serious risk of harm from violence as described in

this Complaint, but he deliberately ignored the known risk of serious harm to prisoners. Defendant Johnson is sued in his individual capacity.

18.     Linwood Burns was an officer at Hays State Prison at all times relevant to this action. Officer Burns was on duty as the A-Building Control Room Officer and was charged with monitoring inmates residing therein, including Damion MacClain, when Mr. MacClain was murdered. Prior to and at the time of Mr. MacClain's death, Officer Burns knew that Hays was a maximum security prison with a high rate of violence, an armed inmate population, and malfunctioning door locks. Officer Burns also knew that, seven days earlier, a prisoner had been murdered. Prior to and at the time of Mr. MacClain's death, Officer Burns further knew that numerous inmates in A-Building had left their cells after a lockdown order had been issued, but he failed to take reasonable steps to ensure that inmates were secured back in their cells or to alert other correctional staff to this serious risk to prisoners' safety. Defendant Burns knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners. Defendant Burns is sued in his individual capacity.

19. The Defendants are citizens of the United States and the State of Georgia. At all times relevant herein, the Defendants acted under color of state law based on their positions within the Georgia Department of Corrections.

## VI.   STATEMENT OF FACTS

### A.   Conditions Posing a Substantial Risk of Harm to Damion MacClain and Other Prisoners at Hays State Prison

20. Prior to and at the time of Damion MacClain's death, the following conditions at Hays State Prison posed a substantial risk of harm to Hays State Prison inmates:

(a)   Fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization.

(b)   Inmates throughout the prison possessed weapons such as shanks and knives.

(c)   Weapons were not confiscated from prisoners as required by standard operating procedures.

(d)   Stabbings and deaths were frequently reported.

(e)   Critical security posts were unmanned because the prison was understaffed.

(f)   Known violent prisoners were not monitored and supervised, which contributed to inmate-on-inmate violence.

(g)   Locks on the doors to cells did not work, allowing inmates to avoid being locked down and preventing effective separation of inmates from one another.

(h)     Prisoners routinely slept in cells to which they were not assigned.

(i)     Gang leaders exercised control over housing assignments and were permitted to expel prisoners they no longer wanted in their dorms.

(j)     Prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

(k)     Officers were stabbed or otherwise seriously injured on several occasions.

(l)     Officers often remained in control rooms because they were afraid to enter prison dorms.

21.     The foregoing conditions posed a significant risk of harm to prisoners in violation of clearly established law.

22.     The Defendants were on notice of and subjectively aware of the foregoing critical problems of safety, security, and violence at Hays State Prison and of the specific risk that the prison conditions presented to Mr. MacClain, as demonstrated by the following:

(a)     Plaintiff notified Warden Tatum that Mr. MacClain had been threatened by inmates, was in danger, and needed to be transferred to another prison. Plaintiff conveyed this information directly to Warden Tatum by telephone. Plaintiff further contacted Deputy Warden Betty Bailey-Dean on several occasions in 2012 to report that her son was in danger and sought a transfer to another prison.

(b)     Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Clark reviewed incident reports in which a high rate of deaths, stabbings, and assaults was documented. These incident reports put the Defendants on notice of the serious risk of harm to and life-threatening conditions for inmates.

(c)     Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Clark knew that GDC internal audits found a pervasive problem of broken locks on cell doors, year after year, from approximately 2008 until 2012.

(d)     Defendants knew that Hays officers had been critically injured by prisoners wielding weapons.

(e)     Defendants knew that the security failures described above had contributed to the death of another prisoner on December 19, 2012.

(f)     Defendants knew that many prisoners and prisoners' family members complained about the unusually high level of violence at Hays State Prison and the safety of inmates there.

(g)     Defendants Owens and Tatum received written notice of the dangerous conditions at Hays.  On February 17, 2012, the Southern Center for Human Rights (SCHR) wrote to Commissioner Owens and GDC Legal Counsel Robert Jones regarding the rising number of homicides and assaults at Hays and other GDC facilities.  SCHR received no response to its letter.

23.     Despite this notice that conditions at the prison were intolerable and unconstitutional, the Defendants permitted security conditions at Hays to further deteriorate.

24.     The Defendants failed to take reasonable steps to fix broken locks at Hays, as described in Section C below.  Consequently, cell door locks in prison dormitories remained broken for years, permitting close-security inmates at this maximum-security prison to enter and exit their cells – at virtually any time of day or night – as they pleased.  The Defendants failed to fix the locks and failed to take other reasonable steps to control inmate movement.

25.     The Defendants knew that Hays was not adequately staffed and failed to take reasonable steps to ensure adequate staffing.  At the time of Mr. MacClain's death, approximately fifteen percent of officer positions at Hays were vacant.  The vacant positions meant that less than a full staff was on duty at the time of Mr. MacClain's death.  Security posts were left unmanned, leaving inmates without supervision.

26.     Defendants Tatum, Hatcher, and Clark continued to permit gangs to control dorm housing assignments.  As a matter of course, officers led newly-arrived prisoners to a dorm and told them to find an open bunk.  Then gangs would tell the new arrivals where to sleep and were permitted to expel prisoners that they did not want in their dorms.

27.     Defendants Tatum, Hatcher, and Clark were deliberately indifferent to the prevalence of contraband known to permeate the facility, including knives, cell phones, and drugs.  They failed to ensure that prisoners found with shanks were disciplined to deter inmates from possessing deadly weapons.  They failed to ensure that officers conducted adequate contraband searches.

28.     Defendants Hatcher and Clark deliberately interfered with efforts by GDC tactical squads to search the prison.  Defendants Hatcher and Clark warned

inmates about upcoming shakedowns in order to achieve positive reviews on departmental security audits. They ordered correctional staff to go dorm to dorm to alert inmates to hide or dispose of contraband before tactical security squads arrived to search the prison. On at least one occasion, in June 2011, Defendant Hatcher ordered a Unit Manager to tell inmates that they would get pizza and chicken if the squad did not find contraband. In so doing, Defendants Hatcher and Clark violated Georgia law and GDC policy, undermined officers' authority, and contributed to the breakdown in security that led to the deaths of Mr. MacClain and three others.

## B. History of Widespread Abuse and Violence at Hays

29.    As a result of the foregoing conditions and the Defendants' deliberate indifference to them, an atmosphere of chaos and violence reigned at Hays.[7] According to GDC Incident Reports:

---

[7] Plaintiff cannot list all of the assaults at Hays because the GDC has failed to disclose all of the incident reports documenting these assaults. Starting in February 2013, SCHR sought incident reports showing the level of violence at Hays State Prison. The GDC initially failed to produce the documents, and later demanded a quarter of a million dollars for a limited number of records regarding Damion MacClain and violence at Hays. After RaHonda MacClain filed an Open Records Act lawsuit, GDC produced some, but not all, records. The incident reports produced reflect only some of the violent incidents at Hays and do not reflect the number of assaults in the GDC's own monthly summaries.

(a)     On August 20, 2011, inmate Alford Morris was murdered with a shank;

(b)     On October 7, 2011, one prisoner was stabbed eight times in the head and back and was transported to the emergency room in serious condition; another prisoner was sent to the hospital with five stab wounds;

(c)     On February 28, 2012, two officers were stabbed by a prisoner with a "home made sharpened weapon." Both were rushed to the hospital via ambulance "for severe injuries."[8]

30.     Despite the rising tide of violence, the Defendants still failed to fix broken locks and failed to reasonably respond to unsafe conditions that permitted the violence to occur. Yet, on May 29, 2012, the GDC inexplicably named Hays State Prison as "Facility of the Year"—an honor bestowed partly in recognition of the low amount of contraband found after Defendants pre-warned inmates of tactical squad searches.[9]

31.     Thereafter, the number of broken locks at Hays increased, the conditions deteriorated further, and the violence worsened. In the five months preceding Mr. MacClain's death, numerous prisoners were stabbed as a result of these conditions. At least 15 men required off-site emergency medical care for

[8] Ga. Dep't of Corrections, Incident Report No. 92524, Feb. 28, 2012.

[9] Ga. Dep't of Corrections, News Release, Hays State Prison Honored Named Facility of the Year, media.timesfreepress.com/news/.../01/.../2011_Facility_of_the_Year.doc.

serious injuries. The following incidents were documented in GDC Incident

Reports written by Hays officers:

(a)     On July 27, 2012, an inmate reported he had been "tied up" in a cell and beaten. He was transported to an offsite hospital for "abrasions and 2 puncture wounds to face, back, left hand, left leg and foot and right foot possible broken nose."

(b)     On July 28, 2012, an inmate was transported to the hospital by ambulance after an officer noticed him "bleeding profusely," with "multiple lacerations and puncture wounds to head, cheeks, ear, chest, back both arms and hands."

(c)     On August 10, 2012, an officer observed an inmate "bleeding from his face and head" with "abrasions contusions, lacerations and punctures to head, eye, face, chest, back and both arms."

(d)     On August 18, 2012, an inmate was transported to the hospital after an assault which caused "abrasions, contusions, lacerations and punctures to head, nose, both ears, left leg and right arm."

(e)     On August 19, 2012, an officer observed two inmates running "with what looked to be shanks" and saw a third inmate "stumble downstairs with blood on his back." The injured inmate had "contusions and lacerations to [his] back" and was transported to a hospital.

(f)     On August 31, 2012, an officer saw "several inmates fighting with weapons" and an inmate "covered in blood with visible injuries." The inmate was taken by ambulance to the hospital with "17 lacerations/puncture wounds to chest and back and both arms."

(g)     On September 1, 2012, an officer witnessed an inmate "approach [another inmate] from behind and stab him in the back multiple times with a sharp pieces [sic] of metal." The injured inmate was transported to the hospital for "lacerations and puncture wounds to chest, sides, back and arms."

(h)     On September 4, 2012, an officer observed an inmate with "multiple stab wounds to head, back and left arm."  The prisoner was sent by ambulance to the hospital.

(i)     On September 9, 2012, an inmate with "blood on his clothing" approached an officer for help.  He was transported to the hospital for "multiple lacerations and punctures to his chest, neck, left foot and back."

(j)     On September 21, 2012, an inmate who "appeared to have been assaulted" asked an officer to be moved to another dorm.  He had a swollen face and "contusions, lacerations to head, eyes, face and back."

(k)     On September 25, 2012, an officer observed an inmate "standing with blood coming [out] of his mouth" with "contusions and lacerations to head, mouth and lips."

(l)     On September 28, 2012, a prisoner being chased by other prisoners jumped off the top tier of the prison dorm, "dropped to the bottom range," and was stabbed by several prisoners.  He was taken to an offsite hospital for "multiple lacerations to head, face, buttock and both hands."

(m)     On September 28, 2012, an officer "noticed [an inmate] come from his room [] covered in blood."  The inmate was sent to the hospital for "blunt injuries to facial [sic], head, both ears, nose and lip area."

(n)     On October 3, 2012, an officer saw an inmate "bleeding" with "visible injuries" including "30 lacerations/puncture wound[s] to back and legs."

(o)     On October 7, 2012, a bleeding man "collapsed on the sidewalk" after being stabbed in the chest, shoulder, and head.  Prison medical staff was summoned, and the prisoner was taken by ambulance to the hospital.  Bloodied knives were recovered from the dorm.

(p)     On October 27, 2012, an inmate with a "swollen face" and "abrasions, contusions and lacerations to head, both eyes and both arms" approached an officer saying he had been assaulted.

(q)     On October 29, 2012, an officer saw an inmate "on the ground with blood coming from his face."  The prisoner was transported to the hospital for "contusions and lacerations to head, ear, nose and face."

(r)     On November 1, 2012, two inmates stabbed another inmate with a "7 inch sharp metal weapon," causing the injured inmate to sustain "lacerations to forehead and back of head."

(s)     On November 5, 2012, two inmates reported being assaulted.  One had blood on his clothes and [was] bleeding from the lip," and the other was "bleeding from the nose."

(t)     On November 20, 2012, a prisoner reported that he had been assaulted by gang members.  He was "bleeding from the nose and had a big knot on his forehead."

(u)     On November 27, 2012, a prisoner who reported that he had been assaulted by six prisoners had "several abrasions to [the prisoner's] face and knots on the back of his head."

(v)     On December 7, 2012, a prisoner who had been in his new dorm "for 5 minutes" approached an officer who "noticed he had been beaten badly."  The prisoner had "contusions to head, eyes, mouth and nose."

(w)     On December 8, 2012, two prisoners approached an officer, one of whom was "badly beaten."  The man had "abrasions, lacerations and contusions to head, nose, face, mouth, neck, back and both arms and legs" and was sent to the hospital.

(x)     On December 9, 2012, an officer witnessed a prisoner "attacking" another prisoner.  The injured man was taken to the hospital due to a "laceration to left ear and top of head."

(y)     On December 10, 2012, an officer observed a prisoner coming down the stairway and "noticed his shirt was covered in blood on both shoulders." As the officer talked to the injured man, "blood started running thru [sic] his shirt on the right shoulder."  He was treated for "lacerations to eyes, head, chest, top of both arms front and back."

(z)     On December 11, 2012, an inmate was hospitalized after suffering "multiple abrasions, contusions, lacerations and possible fracture to head, eyes, cheek, face, mouth and left foot."

32.     On December 19, 2012, Derrick Stubbs was found dead in his segregation cell.  Upon information and belief, he had been assaulted in another part of the prison where locks did not work.

33.     The foregoing history of widespread abuse put Defendants on notice of the need to correct dangerous conditions at Hays.    Even after Mr. Stubbs' death, however, the Defendants failed to take reasonable steps to fix the prison's broken locks, to control inmate movement, or to otherwise address the lawlessness.

34.     On December 26, 2012, one week after Mr. Stubbs's death, inmates killed Damion MacClain.

35.     Conditions were out of control at the time of Mr. MacClain's death and remained that way in the following weeks.  On January 3, 2013, an inmate assaulted another inmate with a sharpened piece of metal.

36.     On January 12, 2013, a prisoner chased another prisoner and stabbed him with "a sharpened piece of metal."

37.     On January 18, 2013, Nathaniel Reynolds was murdered with a shank.

38. On January 24, 2013, a minimum security inmate who had been placed in one of the prison's most dangerous dorms was raped.

39. On January 25, 2013, a Hays prisoner was stabbed 25 times.

### C. Long History of Known Broken Cell Door Locks at Hays

40. For years, Defendants were on actual notice that cell door locks at Hays did not work, permitting inmates at this maximum security prison to come and go as they pleased.

41. Broken and defeated cell door locks were listed as a "Major/Critical Finding" on engineering audits at Hays in 2008, 2009, 2010, 2011, and 2012. As the following chronology shows, the problem worsened as the years passed.

42. On August 5, 2008, an Engineering Comprehensive Audit by the GDC's North Field Engineering department found that 65 locks were "defeated" and stated that "[t]he locks need to be repaired or replaced."

43. On November 3, 2009, an Engineering Comprehensive Audit by the GDC's North Field Engineering office discovered a "[h]igh number of locks that can be defeated." It further noted that "[e]ngineering has Hays on the list for a complete lock replacement."

44.     Another Engineering Comprehensive Audit conducted by the GDC's North Field Engineering office between July 19, 2010, and July 21, 2010, listed "Locks and Locking Control Panel" under "Major/Critical Findings."

45.     On July 26, 2010, the GDC's Audits and Compliance Unit sent a letter to Warden Tatum making a finding that "Locks and Locking Control Panels can be easily opened."

46.     An Engineering Audit conducted by the GDC's North Field Engineering office between May 31, 2011, and June 2, 2011, listed "The Locks and Locking Control Panels" under "Major/Critical Findings."  The Audit noted that Hays would be getting a new locking control system.

47.     Broken door locks were also well documented in incident reports, which were written by officers and reviewed by Defendants.  For example, on May 31, 2011, Officer D. Cadle wrote in a Use of Force Supplemental Report that a prisoner who refused to remain in his cell attacked him: "Inmates were on lock down[.]  Inmates came out of cell [and] refused to return back to cell after a direct order."

48.     A report summarizing an Engineering Comprehensive Audit that took place between September 26, 2011, and September 27, 2011, listed "DOOR

LOOCKS" [sic] under "Major/Critical Findings." The report further stated that 119 out of 365 – or nearly one-third – of door locks tested had "problems." A "Breakdown of Lock Audit Problems Found at Hays SP" on September 27, 2011, indicated that deadlocks could be defeated for 21% of the 365 locks tested. The Executive Summary of the Comprehensive Audit, written by the Audits and Compliance Unit, and sent to Warden Tatum on September 28, 2011, stated "Finding: Locks and Locking Controls – The locks in the inmate housing area could be easily defeated."

49.    A report summarizing an Engineering Comprehensive Audit that took place between September 10, 2012, and September 12, 2012, stated "High Number of Cell Door Locks that will not Deadlock." The report further found that of 442 locks checked, 184—*41% of the locks tested*—were able to be "defeated."

50.    Warden Tatum prepared an "Executive Summary" on October 16, 2012, stating, "Findings: Locks and Locking Controls – High number of cell door locks were able to be defeated."

51.    Although Defendants and other GDC officials knew that this maximum security prison lacked functioning cell door locks, they were deliberately indifferent in failing to take reasonable steps to fix this problem (or to

otherwise control inmate movement) even after prisoners had been killed as a direct result of security failures.

52.    After the deaths of Mr. MacClain and other inmates, on February 14, 2013, the GDC submitted a "Purchase Order" for the replacement of the locks at Hays.  The purchase order acknowledged that broken locks had resulted in attacks on inmates and staff:

> Hays State Prison *has had recurring problems* with the Cell Door locks in its housing units.  This situation has *severe security implications* in that *breaches of the locks have resulted in attacks on inmates and staff.*  This is a situation which must be addressed and corrected as fast as possible and therefore GDC has chosen to contract directly with a company to replace the existing locks with more secure locking system.  This is considered an Emergency Purchase situation.

53.    This purchase order was submitted over four years after audits clearly revealed a serious problem with broken locks at Hays State Prison.

## D.    History of Threats Against Damion MacClain

54.    At the end of 2011 or early in 2012, Plaintiff RaHonda MacClain began to receive telephone calls from unknown GDC inmates asking her for money.

55.     At around the same time, Damion MacClain reported to Plaintiff that he was being threatened with violence by prisoners, that he needed to be moved to another prison, and that he worried he would not make it out of prison alive.

56.     In response, Plaintiff called Hays State Prison and spoke to Warden Tatum.  Plaintiff told Warden Tatum that her son was in danger, that he was being threatened with violence by inmates, and that he needed to be moved to another prison.

57.     Mr. MacClain was not transferred, and no steps were taken to ensure his safety.

58.     Plaintiff continued to call the prison regarding her son's safety concerns.  In August 2012, Plaintiff told Deputy Warden Betty Bailey-Dean that her son wanted to be transferred because he had been threatened and was in danger.  Plaintiff had two subsequent telephone conversations with Deputy Warden Bailey-Dean.  Deputy Warden Bailey-Dean informed Plaintiff that the matter had been referred to Mr. MacClain's prison counselor.

59.     Mr. MacClain was not transferred thereafter, and Defendants failed to take reasonable alternative steps to ensure his safety.

### E.     <u>Murder of Damion MacClain</u>

60.     The events upon which this action is based occurred on the night of December 25, 2012, and the morning of December 26, 2012. At that time, Damion MacClain was an inmate at Hays State Prison and was housed in dorm A2. His security level was "medium."

61.     Mr. MacClain was technically assigned to cell no. 112. However, Defendants permitted gang leaders to control housing assignments at Hays State Prison. Thus, inmates did not sleep in their assigned cells.

62.     On the night of Mr. MacClain's death, there was no dorm officer assigned to dorm A2, which held 62 men. Rather, one officer was assigned to supervise both dorm A1 and dorm A2, holding about 124 men.

63.     Late on the evening of December 25, 2012, officers ordered inmates to "lockdown," meaning to leave the dormitory dayroom and enter their cells to be locked in for the night.

64.     Because cell door locks did not work many inmates in dorm A2 and throughout the prison's dormitories ignored the evening lock down order, coming and going from their cells throughout the night. After lockdown on December 25, 2012, many inmates remained in the dorm A2 day room drinking prisoner-made

alcohol.  Defendants Johnson and Burns knew that prisoners in dorm A2 ignored the lockdown order, but made no attempt to enforce it, to summon assistance, or to otherwise ensure that prisoners remained in cells.

65.    After A2 dorm was supposed to be locked down, a group of gang-affiliated prisoners confronted Mr. MacClain, who was not gang-affiliated, in and around cell no. 220.

66.    Numerous witnesses heard sounds of a fight.  Again, no officer responded.  Mr. MacClain was stabbed and beaten in or around cell no. 220.  A prisoner-witness heard Mr. MacClain scream, "Let me out of here!"  He then heard Mr. MacClain scream, "Help me!" about three times.

67.    No officer was present before the assault.  No officers came when Mr. MacClain screamed for help.  No dorm officer patrolled A2 dorm during the hours before midnight on December 25, 2012.

68.    According to the A2 Dorm Control Room Log Book (a log maintained by officers to record the day's events), at 12:13 a.m. on December 26, 2012, an officer witnessed "yelling and clutter" on A2 around cell no. 220.

69.    Officer Burns summoned other correctional personnel to report a fight.  At 12:17 a.m., Lieutenant Clark and Officer Bowman discovered Mr.

MacClain in cell no. 220.  He was on the bottom bunk and was unresponsive.  Four to five other prisoners were found in the cell with him.

70.     At 12:32 a.m., two nurses arrived in A-dorm.  A nurse who examined Mr. MacClain found that he was not breathing and had no pulse.  Blood was coming from his nose.  CPR was attempted, but abandoned.  The County Coroner pronounced Mr. MacClain dead at the prison at 1:50 a.m.

71.     Mr. MacClain suffered stab wounds and blunt force trauma.  The incident report noted: "Bruising and swelling to left side of head, bleeding and wound above bridge of nose, inmate determined to be deceased."  The A2 Dorm Control Room Log Book noted that Mr. MacClain had been stabbed.  The death certificate lists the cause of death as strangulation.

72.     According to the A2 Dorm Control Room Log Book for December 25 and 26, no officer had made a security round in the dorm in the approximately four hours before officers found Mr. MacClain's body.

73.     On the day after Mr. MacClain was killed, prison officials remained unable to keep men in the A2 dorm in their cells. An officer's entry into the A2 Dorm Control Room Log Book on December 26, 2012 at 7:30 p.m. reads,

> When B-Nights [officers] arrived, [Dorm] A-2 was suppose [sic] to be on lockdown.  We observed the doors were still on access and inmates were on

the floors.  We took all doors off access and inmates were put in there [sic] rooms and doors were closed.  *Mins later inmates were out of there [sic] rooms and on the floor.*

## VII.   COUNT I

### Violation of Eighth and Fourteenth Amendments
### to the United States Constitution and 42 U.S.C. § 1983

74.    Plaintiffs incorporate herein and re-allege, as if fully set forth herein, all factual allegations set forth in ¶¶ 1-7 and 19-72.

75.    Defendants' policies, practices, acts, and omissions placed Damion MacClain at unreasonable and foreseeable risk of serious injury and death.

76.    Defendants acted with deliberate indifference to the safety of Mr. MacClain and other prisoners and officers at Hays State Prison.  As a consequence, Mr. MacClain was incarcerated under conditions posing a substantial risk of serious harm.

77.    Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Mr. MacClain and constitute clearly-established violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.  As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Damion MacClain

32

was left unprotected; was attacked; experienced grave physical, emotional, and psychological injury and pain; and died.

78.     The Defendants' above-described actions were deliberate and in reckless disregard of the constitutional rights of Mr. MacClain.  Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial.  Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at this institution.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

(a)     Assume jurisdiction over this action;

(b)     Grant Plaintiff a trial by jury;

(c)     Declare that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States;

(d)     Enter judgment in favor of Plaintiff and against each Defendant for all damages allowed by law, including, but not limited to:

    i.   The full value of the life of Damion MacClain;

    ii.  Pain and suffering;

    iii. Funeral and burial expenses;

iv.  Nominal damages; and

v.  Punitive damages.

(e)     Award Plaintiff the costs of this lawsuit and reasonable attorneys'

and expert fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c)

and as otherwise allowed by law;

(f)     Order such additional relief as this Court may deem just and proper.


*[signatures appear on the next page]*

Respectfully submitted this 4th day of September, 2013.

s/Sarah Geraghty
Sarah Geraghty
Georgia Bar No. 291393
Melanie Velez
Georgia Bar No. 512460
SOUTHERN CENTER FOR
   HUMAN RIGHTS
83 Poplar Street, N.W.
Atlanta, GA 30303
Telephone: (404) 688-1202
Facsimile: (404) 688-9440
*sgeraghty@schr.org*
*mvelez@schr.org*

s/ Lawrence J. Bracken II
Lawrence J. Bracken II
Georgia Bar No. 073750
Andrew A. Stulce
Georgia Bar No. 882889
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190
*lbracken@hunton.com*
*astulce@hunton.com*

*Counsel for the Plaintiff*